# EXHIBIT 1

**JAMS ARBITRATION CASE REFERENCE NO. 5100003374**

**BRIDGE Housing Corporation**,

Claimant,

v.

**Addie Smith**,

Respondent.

---

# ***AMENDED FINAL AWARD***

**Counsel:**

Carissa David
Venable LLP
1144 15th Street Suite 3600
Denver, CO 80202
CDavis@Venable.com
Claimant Phone: 303.301.1492

Party Represented: Bridge Housing Corporation

William Briggs, II
Venable LLP
2049 Century Park East Suite 2300
Los Angeles, CA 90067
wjbriggs@venable.com
Claimant Phone: 310-229-9900 Fax: 310-229-9901

Party Represented: Bridge Housing Corporation

Addie Smith
1415 Southeast Pardee Street, #404
Portland, OR 97202
absm6929@gmail.com
Respondent Phone: 971-400-5470

Party Represented: Addie Smith

**Arbitrator:**

Hon. Randa Trapp, (Ret.)

JAMS
401 B Street, Suite 2100
San Diego, CA 92101
619.236.1848 619.236.9032 (fax)
rtrapp@jamsadr.com

**Date of Final Award: December 23, 2025**

THE UNDERSIGNED ARBITRATOR, having been appointed on September 2, 2025, and in response to Claimant's Notices of Continuous Violations of Injunction and Request for Immediate Intervention and Sanctions, having examined the submissions, proof and allegations of the parties, and on November 25, 2025, having issued Judgment in favor of Claimant BRIDGE Housing Corporation ("BRIDGE") and against Respondent Addie Smith for defamation and tortious interference with business claims, Judgment in favor of BRIDGE and against Respondent Addie Smith on her "Counterclaim pursuant to ORS 659A.199.", and Permanent Injunction against Respondent Addie Smith. And having examined the submissions, proof and allegation of the parties regarding Claimant's Request for Attorney's Fees and Costs and Respondent Addie Smith's post judgment responses, objections, and numerous unrelated exhibits, including but not limited to, Respondent's Response to [Proposed] Final Order from Claimant; and Objection to Claimant's Petition For Attorney's Fees And Costs, and having found said responses and objections to be without merit, the Arbitrator now finds, concludes and issues this Final Award as follows:

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Parties

BRIDGE owns, develops, and operates affordable housing across the West Coast (the Portland and Seattle metropolitan areas and throughout California). In doing so, BRIDGE creates

safe, healthy, and affordable communities for those in need, offering a range of affordable, multifamily housing communities. BRIDGE heavily relies on steady funding from government entities, tax-exempt bond financing, and low-income housing tax credits, as the provision of affordable housing cannot support itself.

Governmental entities often publish requests for proposals and notices of funding availability, and award projects and funds to qualified applicants, like BRIDGE. These projects and funding awards, as well as allocation of tax-exempt bond financing and low-income housing tax credits, are highly competitive. BRIDGE's business is dependent on its ability to compete effectively for these projects and funds, and to maintain good relationships with governmental entities, affordable housing lenders, and investors.

Respondent Addie Smith [“Respondent” or “Ms. Smith”] applied to work at

BRIDGE on or around June 13, 2025. After several rounds of interviews, Respondent was offered the position of Regional Property Supervisor. Her first day of work was June 30, 2025. On July 25, 2025, approximately three (3) weeks later, she was notified of her termination. Although Ms. Smith claims she was a “stellar, loyal, hardworking, knowledgeable, and dedicated employee,” the evidence showed otherwise. Ms. Smith was insubordinate, violated company policies, racked up multiple complaints from other BRIDGE employees and tenants of BRIDGE's affordable housing complexes, and failed to correct her offensive behavior. Immediately after BRIDGE terminated Ms. Smith's employment, she commenced a campaign of vicious defamation of BRIDGE and its leadership, and she tortiously interfered with BRIDGE's existing and prospective business.

**The Arbitration Agreement**

In connection with her employment with BRIDGE, on June 23, 2025, Ms. Smith executed an Arbitration Agreement (“Agreement”). The parties to the Agreement are BRIDGE Housing

Corporation") ...BRIDGE Property Management Company, and Addie Smith.[1] The Agreement provides that disputes will be arbitrated "under the then current JAMS Employment Arbitration Rules & Procedures ("JAMS Rules")... provided however, that if there is a conflict between the JAMS Rules and this Agreement, this Agreement shall govern." The Arbitrator "shall apply the substantive federal, state, or local law applicable to the claims asserted." The Agreement provides that the Arbitrator may "award any remedy to which a party is entitled under applicable law." JAMS Rule 24(c)–(d) provides that "[t]he Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the Parties' agreement, including, but not limited to, specific performance of a contract or any other equitable or legal remedy... [i]ncluding interim or partial rulings, orders and Awards."

**Procedural Background and Claims**

On August 8, 2025, BRIDGE filed a Demand for Arbitration and Statement of Nature of Disputes and Claims for Relief. BRIDGE asserted claims for Tortious Interference with Economic Relations, Defamation (Libel and Slander), and for Injunctive Relief. BRIDGE sought actual and consequential damages, punitive damages, attorneys' fees, costs, expert witness fees, available penalties, pre-judgment and post-judgment interest, and for such further legal and equitable relief available and as the Arbitrator deems just and proper. BRIDGE also sought a temporary restraining order, and preliminary and permanent injunctive relief precluding Ms. Smith from interfering with and disparaging BRIDGE (including its directors, officers, and employees).

On September 10, 2025, BRIDGE filed a Motion for Temporary Restraining Order and Preliminary Injunction.

[1] In the Agreement, "you" refers to Ms. Smith.

On September 28, 2025, Ms. Smith filed a "Response and Counterclaim." While Ms. Smith generally denied wrongdoing, she did not deny the bulk of BRIDGE's factual allegations that detailed her conduct after her employment was terminated. This was the conduct that primarily formed the basis of BRIDGE's claims. Instead, Ms. Smith generally disputed her criminal and civil litigation history, asserted that she should not have been fired from past jobs, and asserted that she should not have been fired from BRIDGE.

Ms. Smith asserted a counterclaim based on her employment and termination from BRIDGE. Ms. Smith asserted her claim under Or. Rev. Stat. § 659A.119 *et seq.*, or "Wrongful Termination for Unlawful Reasons/Retaliatory Termination." Ms. Smith asserted that her termination from BRIDGE was "illegal and retaliatory." Specifically, Ms. Smith alleged that she was terminated for "report[ing] racism and discrimination and health and safety violations."

BRIDGE submitted an Answer to the Counterclaim on October 10, 2025. BRIDGE denied any unlawful conduct.

On September 30, 2025, the Parties attended a Preliminary Hearing and Scheduling Conference. BRIDGE's Counsel stated that they did not consent to Ms. Smith video recording them, at that hearing and in the future. The Arbitrator asked Ms. Smith if she was recording, to which Ms. Smith stated that she was not. The Arbitrator explicitly ruled that Ms. Smith was not permitted to video record hearings and the only recordings permitted would be through approved methods to which the parties consented. The Arbitrator memorialized her ruling in the Scheduling Order dated October 1, 2025.

On October 31, 2025, a hearing was held on the merits of BRIDGE's Motion for Temporary Restraining Order and Preliminary Injunction. Ms. Smith asked to video record the hearing. That request was denied. In direct violation of the Arbitrator's orders, Ms. Smith covertly recorded both the Scheduling Conference and the October 31, 2025, hearing.

Ms. Smith had full and fair opportunity to present her opposition to BRIDGE's Motion for Temporary Restraining Order and Preliminary Injunction. Ms. Smith availed herself of that opportunity by filing a written response, numerous exhibits, and presenting her arguments at the October 31, 2025, hearing. While Ms. Smith denied that her conduct was unlawful, she did not deny that she had contacted numerous third parties with whom BRIDGE transacts business, and she did not deny making highly inflammatory and defamatory statements about BRIDGE and its principals. Ms. Smith presented evidence in attempt to prove her defamatory statements about BRIDGE were true. That evidence was woefully deficient.

On November 4, 2025, the Arbitrator entered an Order granting BRIDGE's Motion for Temporary Restraining Order and Preliminary Injunction ("Preliminary Injunction").[2] The Preliminary Injunction provided as follows:

> Respondent Addie Smith is enjoined from taking any action, directly or indirectly, that is intended to or has the effect of interfering with [BRIDGE's] business relationships through defamatory statements or otherwise. Specifically, Ms. Smith shall cease and desist from contacting third parties to the extent such contact involves prohibited statements about BRIDGE.
>
> Third parties include, but are not limited to, all of BRIDGE's current and prospective funders, donors, lenders, housing authorities, general contractors, subcontractors, oversight agencies and commissions, and other entities with whom BRIDGE transacts business. Third parties include individuals who are employed by, sit on the Boards of, or are affiliated with any of the foregoing third parties.
>
> Prohibited statements include, but are not limited to, those which are designed to, or have the effect of discouraging the third party from entering into or continuing its relationship with BRIDGE.
>
> Statements are about BRIDGE if the reasonable listener would believe they relate to the company itself or BRIDGE's leadership or employees acting in their capacity as such.
>
> This Order shall remain in effect until a final judgment on the merits is rendered.

---

[2] On November 10, 2025, the Injunction was amended and refiled to correct a scrivener's error.

Immediately after the Preliminary Injunction was issued, Ms. Smith proclaimed that she would not abide by the Preliminary Injunction or any of the Arbitrator's other orders. Ms. Smith went on a tirade, egregiously defaming BRIDGE and its principals, attempting to coerce decision-makers and third parties to end their relationships with BRIDGE, distributing snippets of her surreptitious recordings of the hearings, and making false accusations about BRIDGE's counsel and the Arbitrator. Ms. Smith was repeatedly warned that her continued violation of the Preliminary Injunction and Arbitrator's other orders would result in serious sanctions, including judgment in BRIDGE's favor on its claims and her counterclaim, under JAMS Rule 29, which provides:

> The Arbitrator may order appropriate sanctions for failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator. These sanctions may include, but are not limited to, assessment of Arbitration fees and Arbitrator compensation and expenses; any other costs occasioned by the actionable conduct, including reasonable attorneys' fees, exclusion of certain evidence; drawing adverse inferences; or, in extreme cases, determining an issue or issues submitted to Arbitration adversely to the Party that has failed to comply.

Ms. Smith was undeterred, and she continued to violate the Preliminary Injunction and the Arbitrator's other orders.

BRIDGE filed three separate Notices of Injunction Violations (dated November 10, 2025, November 11, 2025, and November 17, 2025) and a fourth Notice of Supplemental Evidence (dated November 24, 2025). BRIDGE provided the Arbitrator with evidence of multiple instances where Ms. Smith violated the Preliminary Injunction and the Arbitrator's other orders prohibiting distribution of the unlawfully recorded videos. Ms. Smith filed written responses to the notices. Ms. Smith did not deny taking the actions described in the notices, nor did she deny violating the Arbitrator's other orders. Instead, Ms. Smith argued that she was justified in taking such actions.

A noticed hearing on Ms. Smith's repeated violations of the Preliminary Injunction and Arbitrator's other orders was held on November 24, 2025. Ms. Smith was aware of the hearing but proclaimed she would no longer participate in the Arbitration.

Based on BRIDGE's four notices, the evidence presented, and the proceedings thus far, including Ms. Smith's emphatic proclamations that she would not comply with the Arbitrator's orders, and she would no longer participate in the Arbitration, the Arbitrator determined this was an extreme case under JAMS Rule 29, warranting terminating sanctions. The Arbitrator entered Judgment in favor of BRIDGE and against Ms. Smith on BRIDGE's claims and Ms. Smith's counterclaim. The Arbitrator also entered a Permanent Injunction as follows:

> Respondent Addie Smith is enjoined from taking any action, directly or indirectly, that is intended to or has the effect of interfering with BRIDGE's business relationships through defamatory statements or otherwise. Specifically, Addie Smith shall cease and desist from contacting third parties to the extent such contact involves prohibited statements about BRIDGE:
>
> Third parties include but are not limited to all of BRIDGE's current and prospective funders, donors, lenders, housing authorities, general contractors, subcontractors, oversight agencies and commissions, and other entities with whom BRIDGE transacts business. Third parties include individuals who are employed by, sit on the Boards of, or are affiliated with any of the foregoing third parties.
>
> Prohibited statements include, but are not limited to, those which are designed to, or have the effect of discouraging the third party from entering in to or continuing its relationship with BRIDGE.
>
> Statements are about BRIDGE if the reasonable listener would believe they relate to the company itself or BRIDGE's current or former leadership, or employees acting in their capacity as such. For the avoidance of doubt, BRIDGE's leadership and/or employees includes but is not limited to Ken Lombard, Delphine Sherman, Sierra Atilano, Rebecca Hlebasko, Jen Nelson, Nancy Nelson, Kira Bogle, Marco Ponce, Karen Felix, Chris Felix, and Sarah Buck.

The Arbitrator also certified that Ms. Smith had violated the Preliminary Injunction. The Arbitrator ordered that BRIDGE was entitled to its fees and costs, and that all amounts were subject to 9% interest in accordance with Or. Rev. Stat. § 82.010. The Arbitrator ordered that payment shall begin immediately upon the Arbitrator's order entering the same.

**Factual Background**

Ms. Smith applied to BRIDGE on or around June 13, 2025, when she submitted an application form and resume. As part of Ms. Smith's hiring process, she executed an attestation form certifying that all information provided in her application was true and correct. Ms. Smith's resume and application information was neither complete nor accurate. Ms. Smith provided falsified employment references, and at least one of the telephone numbers for a "professional reference" was actually the telephone number of one of her family members. Ms. Smith did not disclose to BRIDGE that she had a history of assaulting, demeaning, defaming and harassing tenants of the housing complexes at which she worked. Finally, Ms. Smith falsely stated to BRIDGE that she was a Certified Apartment Manager and a Certified Property Manager.

Unaware that Ms. Smith had falsified her history of employment and misrepresented her certifications, and relying on her application information to be truthful and accurate, BRIDGE offered Ms. Smith the position of Regional Property Supervisor. BRIDGE would not have hired Ms. Smith had it known that her application information was incomplete, misleading, and falsified.

Ms. Smith began her first day of work on June 30, 2025. Almost immediately after hire, a switch flipped. Ms. Smith was hostile and confrontational. She sent curt messages to her direct supervisor, Jennifer Nelson (Director of Property Management), and she had a very rude demeanor towards many of her coworkers and the residents of the housing complexes.

Ms. Smith's coworkers complained that she behaved differently when management was around. Ms. Smith targeted several of BRIDGE's white employees, including Ms. Nelson, and commenced a campaign to have those employees fired. To achieve her desired ends, Ms. Smith perpetrated multiple privacy intrusions, inappropriately coerced those that she supervised, and harassed multiple BRIDGE employees.

On multiple occasions, Ms. Smith secretly videotaped and audio-recorded BRIDGE employees without their consent. Ms. Smith coerced those whom she supervised to spy on other BRIDGE employees whom she did not like. She tried to pressure BRIDGE employees into lying to substantiate her theories about why her targets should be fired.

In connection with her targeting specific BRIDGE employees, Ms. Smith brought multiple complaints to BRIDGE's human resources personnel. BRIDGE conducted thorough investigations into the complaints and took action where appropriate.

All the while, Ms. Smith was insubordinate and refused to follow directives. She got into altercations with tenants at the housing complexes at which she worked. Ms. Smith's behavior was so unsettling that employees complained to human resources that they did not want to work with her anymore. While Ms. Smith's conduct would be inappropriate for any employee, it was particularly problematic because she was a member of the management staff and was expected to set a good example. Ms. Smith was counseled on her misconduct and advised that her behavior was unacceptable. While each of Ms. Smith's offenses was serious and could result in immediate termination, BRIDGE sought to work with Ms. Smith to correct her behavior. Unfortunately, no amount of counseling was sufficient, and Ms. Smith continued to exhibit unsettling and unprofessional behaviors. For these reasons, Ms. Smith's employment was terminated. Ms. Smith was notified that her employment was being terminated on July 25, 2025. At the termination meeting, Ms. Smith continued to make false accusations about BRIDGE, its leadership, and the employees she previously targeted.

When BRIDGE completed its background check of Ms. Smith, to which Ms. Smith consented, BRIDGE discovered that Ms. Smith had severely misled BRIDGE about her background and employment history. In addition to discovering that Ms. Smith was not a Certified

Apartment Manager and a Certified Property Manager, that one of her professional references was a family member, and that she had a history of assaulting and harassing the tenants at the affordable housing complexes at which she worked, BRIDGE discovered more troubling facts about Ms. Smith. Although Ms. Smith represented that she worked for only two employers in the past—WinnCompanies (2013–2025) and Greystar (2007–2013)—Ms. Smith did not work for either employer. Between 2007–2025, Ms. Smith had long stretch of unemployment. On the occasions that she was able to land some form of employment, she was frequently terminated within days, weeks, or months of her hire.

None of the newly discovered information was surprising. Ms. Smith had a long history of criminal and civil matters, leading one seasoned judge to remark that Ms. Smith needed a mental health evaluation because her behavior was so "baffl[ing]." *Smith v. State*, 311 Ga. App. 184; 715 S.E.2d 434 (Ct. App. GA 2011). Ms. Smith had numerous stalking protective orders entered against her. With respect to civil matters, Ms. Smith was also previously found liable for defaming her prior landlord, who simply requested that she pay her rent. *Fox v. Smith*, Civ. Action No. 15-1-9035-52 (Sup. Ct. Cobb Cty., GA 2016) (finding Ms. Smith liable for slander and libel when she "engaged in a pattern of serious and false accusations against [her landlord] repeatedly calling him a 'pedophile'" which was a tactic the court recognized as one Ms. Smith frequently employed in other cases, and explaining that her pattern of "behavior not only exhibits a total disregard for the truth as it relates to the Plaintiffs here; but, also that her history betrays a total disregard for the judicial system as well."). It was, therefore, unsurprising that Ms. Smith would find herself embroiled in another dispute—this Arbitration.

After her termination, Ms. Smith repeatedly made specific threats to BRIDGE's leadership and a Board member, stating that she has contacted, and will continue to contact, BRIDGE's

business partners, funders, lenders, housing authorities, and various government agencies and decisionmakers and inform them about all of her "concerns" about BRIDGE. While Ms. Smith alleged that her "concerns" were based on her perceptions, she fashioned those "concerns" as objective statements of fact. Ms. Smith promised that she would do everything in her power to force Mr. Lombard and other BRIDGE leadership to step down. Ms. Smith's goal was to force the entities and individuals that she contacted to stop doing business with BRIDGE. Ms. Smith followed through on her promises, and she repeatedly defamed BRIDGE and tortiously interfered with its business.

## **CONCLUSIONS OF LAW**

### **Ms. Smith Defamed BRIDGE**

To establish a claim for defamation, BRIDGE needed to show that Ms. Smith made a defamatory statement about BRIDGE and published the statement to a third party. A defamatory statement is one that would subject the plaintiff to hatred, contempt, or ridicule, or tend to diminish the esteem, respect, goodwill, or confidence in which BRIDGE is held, or to excite adverse, derogatory, or unpleasant feelings or opinions against BRIDGE. *Neumann v. Liles*, 358 Or. 706, 711–712, 369 P.3d 1117, 1121, (2016). In the professional context, a statement is defamatory if it falsely ascribes to another conduct, characteristics, or a condition incompatible with the proper conduct of a lawful business, trade, or profession. *Id*. Even a communication that is not defamatory on its face may be defamatory if a reasonable person could draw a defamatory inference from the communication. *Reesman v. Highfill*, 327 Or. 597, 604, 965 P.2d 1030, 1034 (1998).

Some defamatory statements are actionable *per se*, meaning the claimant need not establish pecuniary loss or special harm. *Neumann*, 358 Or. at 711 citing *Hinkle v. Alexander*, 244 Ore. 271, 277 (1966) (on rehearing). Libel—that is, written or printed words—are actionable *per se*. *Id*. In

some circumstances, slander (spoken word) may also qualify as defamation *per se*. Words that are actionable *per se* are usually divided into four classes, as follows: (1) words which impute a charge which, if true, will subject the party charged to an indictment for a crime involving moral turpitude, or subject him to an infamous punishment; (2) words falsely spoken of a person which impute that the party is infected with some contagious disease, where, if the charge is true, it would exclude the party from society; (3) defamatory words, falsely spoken of a person, which impute to the party unfitness to perform the duties of an office or employment of profit, or the want of integrity in the discharge of the duties of such an office or employment; and (4) defamatory words, falsely spoken of a party which prejudice such party in his or her profession or trade. *Barnett v. Phelps*, 97 Or. 242, 245, 191 P. 502, 503 (1920). Words that accuse a person of misconduct or dishonesty in the performance of his profession or employment are defamation *per se*. *Wheeler v. Green*, 286 Or. 99, 124, 593 P.2d 777, 791 (1979). Where a defendant begins a coordinated online campaign of false statements, including publicly accusing a plaintiff of design/invention theft, racism, and engaging in fraudulent activity as a means of forcing the plaintiff to flee the market, an injunction is warranted. *Owen v. Askew*, 2025 WL 2251743, at *1–2 (D. Or. Aug. 7, 2025).

As in *Owen*, after Ms. Smith was terminated, she began an online campaign accusing BRIDGE of racism, financial impropriety, incompetence, support of pedophilia, as well as falsely reporting that she was wrongly terminated for reporting these issues and health and safety violations. Most of the communications involve the same "concerns" about BRIDGE executives being racist, supporting pedophilia, being financially incompetent, failing to provide adequate housing, misappropriating funds, or otherwise being led by greed and lining their own pockets. While the full scope of Ms. Smith's misconduct is not yet known, at a minimum, the following are a few examples of Ms. Smith's communications and threats to BRIDGE executives, later extended

to BRIDGE Board members, business partners, funders, lenders, and other entities essential to BRIDGE's survival.

On the day she was terminated, Ms. Smith sent text messages to Mr. Lombard. Ms. Smith wrote that Delphine Sherman, CFO/CPP of BRIDGE, and Chris Felix, Human Resources Information Systems and Benefits Manager, were "liars and very dishonest" and "ignore problems at these properties" and that she would be "contacting every single organization and lender that funds BRIDGE " Mr. Lombard, who is Black, was also told by Ms. Smith that he was a "coward" and surrounded himself with "White racists." She vowed to "do every single thing in her power to make sure [Mr. Lombard] step[s] down I will be speaking at every board meeting about you. You are a horrible example of a Black man " Another text stated that "greed is your guiding factor" and "Ken Lombard is a worthless, lying piece of shit and a coward."

On July 28, 2025, Mr. Lombard received a report that Ms. Smith tried to contact Board member Nathalie Carey. Ms. Smith was instead routed to Ms. Carey's executive assistant, Sue Cowell. Ms. Smith told Ms. Cowell that Ms. Nelson and another BRIDGE employee had made racist remarks, that BRIDGE was engaged in improper spending, and that its properties were uninhabitable.

Kenneth Novack is the Chair of the Board of Directors for BRIDGE. On July 28, 2025, he was informed by his office that he had received a message from Ms. Smith. Mr. Novack called Ms. Smith back, and she told him that she would be contacting BRIDGE funding entities and other board members and was planning to call National Equity Fund ["NEF"], who is one of BRIDGE's largest funders. Ms. Smith sent multiple texts to Mr. Novack, including one telling him she is going to tell every donor about her "concerns."

Ms. Smith also contacted NEF's parent organization, LISC National ["LISC"], through LISC president and CEO Michael Pugh. Ms. Smith stated the funding from NEF is not going to the people it is supposed to serve, and instead is lining Mr. Lombard's pockets, or words to that effect. Ms. Smith also stated that she was fired from BRIDGE for reporting health and safety violations. Ms. Smith stated she was going to take her concerns to the Trump Administration.

Ms. Smith has contacted other existing and prospective funding sources for BRIDGE. The Housing Authority of the County of Los Angeles ["HACLA"] is a primary funder in Los Angeles. On July 30, 2025, Ms. Atilano, BRIDGE's Chief Real Estate Officer, received an email from Jenny Scanlin, Chief Strategic Development Officer at HACLA, about a complaint from a former BRIDGE employee. Ms. Atilano called Ms. Scanlin, who said Ms. Smith tried to reach out to the president and CEO of HACLA, Lourdes Castro Ramirez, but Ms. Smith's call was funneled to Ms. Scanlin. Ms. Scanlin told Ms. Atilano that the complaints were serious and HACLA needed to conduct building site inspections. Ms. Smith informed Ms. Scanlin that she was also reaching out to the HACLA board, and that she would be calling Housing and Urban Development and the Los Angeles City Council.

On September 22, 2025, Ms. Hlebasko, BRIDGE Senior Vice President and General Counsel, spoke on the phone with Michael Rogers, the general counsel of NEF, who advised that LISC had received a call from Ms. Smith. Ms. Smith stated that NEF was not the only BRIDGE funder she was contacting and that she wanted to speak with Mr. Pugh and Matt Reilein, the President & CEO of NEF, before she took her "concerns" to social media and the Trump Administration.

Ms. Hlebasko sent two cease and desist emails to Ms. Smith after seeing "harassing, defamatory and threatening" texts that Ms. Smith sent to Mr. Lombard and forwarded to staff, as

well as texts, emails and conversations Ms. Smith had with Mr. Novack, requesting Ms. Smith cease and desist from making all false, harassing, and defamatory statements, stating that Ms. Smith was attempting to interfere with BRIDGE's business. Ms. Hlebasko also stated that Ms. Smith was not terminated for legal violations, but because of "significant performance issues that were clearly reported to [Ms. Smith]." Ms. Smith received another cease and desist letter from the law firm of Gordon Rees Scully Mansukhami for her false statements about BRIDGE, dissatisfaction with BRIDGE leadership, and particularly Mr. Lombard.

Ms. Smith disregarded the cease and desist letters. On July 31, 2025, Ms. Smith sent an email to attorneys and staff of Gordon Rees Scully Mansukhami that she would speak at every City Council meeting, County Council meeting, board meeting, every agency, entity and organization about what she claims she saw while working at BRIDGE, ending the email with "let's go to court." In another text, she stated her letters will go to Los Angeles Mayor Bass, Yield Giving (charity), the Harry & Jeanette Weinberg Foundation (charity), the John Steward Company (competitor), and on the next day letters will go to Portrait (general contractor that works with BRIDGE), Hearst Foundation, Wells Fargo Foundation, US Bank Foundation, and the Meyer Memorial Trust. BRIDGE has business relationships with all these third parties.

On July 31, 2025, Ms. Smith emailed Ms. Scanlin at HACLA, asking questions as to why BRIDGE was selected to oversee the redevelopment of a project and who made that decision. Ms. Smith wrote that "Ken Lombard and Delphine Sherman know absolutely nothing about property management," but "they smile pretty for cameras." She further wrote that they are "clueless" when it comes to managing housing for low-income people, and that neither visited their properties in Oregon and other states for many years, except for photo-ops. Further, Ms. Smith stated the

budgets were "intentionally, severely, underwritten." She stated that staff were being discriminated against and retaliated against when they complained. These were just some of the statements made.

Ms. Smith continued to contact Mr. Reilin, Mr. Pugh, and Michael Rogers, Senior Vice President and General Counsel of NEF. Ms. Smith's emails and voicemails were long rants about BRIDGE, Mr. Lombard, and Ms. Sherman. She continued to falsely state that: (1) "The grants, loans and donations being provided to Bridge Housing are not 'bridging the wealth gap,'" (2) BRIDGE "is not providing safe and habitable housing," (3) "the properties are failing federal and state inspections," (4) "[t]he budgets are intentionally underwritten. Properties are intentionally underfunded," (5) "African American employees are being referred to as 'niggers' and 'monkeys,'" (6) Mr. Lombard has received compensation that he has "done absolutely nothing to earn," (7) Mr. Lombard and Delphine Sherman "have been protecting White racist committing [] horrible acts," (8) that Mr. Lombard as a Black man has allowed racism and uninhabitable housing, (9) that she was fired for reporting racism and discrimination, and (10) that BRIDGE, Mr. Lombard, and BRIDGE's attorneys support pedophiles and pedophilia. Ms. Smith's contact with NEF has been consistent since BRIDGE was first informed of such contact in late September.

Ms. Smith then went on to target Morgan Stanley, sending multiple emails containing the same outrageous false statements that she published to NEF, LISC, and HACLA:

> I am reaching out to all of you because I am a whistleblower..... The grants, loans and donations being provided to BRIDGE Housing are not "bridging the wealth gap." It is also not providing safe and habitable housing to the families BRIDGE should be served.... the properties are failing federal and state inspections........... The budgets are intentionally underwritten. Properties are intentionally underfunded. Employees working onsite, who are doing all the work that supports BRIDGE Housing, aren't earning living wages. They are being subjected to hostile work environments. The African American employees are being referred to as "niggers" and "monkeys" ...

... Mr. Lombard increased his salary from over $500 thousand to over $1.5 million and an additional $50,000 plus in annual bonuses. Salary and bonuses he's done absolutely nothing to earn.

... Delphine Sherman and Ken Lombard have been protecting the White racists committing these horrible acts. I was terminated as a lesson meant to intimidate the onsite staff. To show them what happens when you speak out against BRIDGE Housing.

... I haven't begun to tell you about the housing safety violations I witnessed during my three (3) short weeks of employment. Mr. Lombard will attempt to tell you and Ms. Chionuma that I lied on my application. This isn't why I was terminated. They will make all sorts of claims. None of them are true. I reported health and safety violations, racism and discrimination. Things that could have been properly addressed and corrected. I should have been allowed to keep my job. Mr. Lombard should have used this opportunity to stand against these issues. He didn't. He also knew that he would be joining forces/partnering with Avanath Property Management and allowing that Black owned and managed property management company to manage BRIDGE's properties and staff. He wouldn't have to accept any responsibility or accountability for his actions. He knew very well these things were happening and said nothing. Mr. Lombard is a Black man. He should have been disgusted. This should have caused Mr. Lombard to want to make this a teachable moment. A history defining moment to say that BRIDGE Housing doesn't tolerate racism and discrimination; that BRIDGE Housing's mission is inclusive.

BRIDGE Housing is not bridging any wealth gap. This isn't their goal. Their goal also isn't to maintain safe and habitable affordable housing...

BRIDGE Housing needs oversight. This may not happen now that this merger with Avanath has taken place. However, if you're providing hundreds of millions of dollars in funding or to develop and manage affordable housing there should be some stipulations. There should be some follow-up and oversight.
BRIDGE should be maintaining the affordable housing they're providing these needy families....

I am among the 300k+ Black women being wrongfully terminated in 2025.

I am informing you of this because your company provided millions in funding to BRIDGE Housing. Do you know where the money is going or how it will be spent? Were there any stipulations in the contract Ms. Chionuma provided to Mr. Lombard? How did this relationship between Morgan Stanley and BRIDGE Housing come about? Where does Morgan Stanley get its funding to provide such incredible amounts of money to BRIDGE Housing? What other non-profit affordable housing programs is Morgan Stanley providing funding? What happens after you cut the check and give it to these organizations?

The very next day, Ms. Smith targeted NEF, making the same false statements that she made in her email to Morgan Stanley. Ms. Smith also specifically threatened Mr. Reilein and Mr. Pugh:

> Some of this information was provided to Matt Reilein and Michael Pugh at LISC. The goal by Matt, Michael and BRIDGE Housing is to silence me after this wrongful termination. I've attempted to speak with Matt Reilein and [sic] Michael Pugh about this; however, they would not speak with me. Affordable housing is not improving. The quality of life for people living in affordable housing isn't improving. The wealth gap isn't improving. The only people getting wealthier are many of you, Matt Reilein, Michael Pugh, Ken Lombard and those in the corporate offices.

When NEF did not respond, she ratcheted up the pressure. Ms. Smith stated that she was going to start "talking to media," and she specifically threatened that "Mr. Reilein and everyone involved with fattening Mr. Lombard's pockets while properties suffer will be held accountable." Ms. Smith ended her rant by making more shocking false accusations against BRIDGE, its counsel, and specific individuals at NEF—accusing all of "support[ing] pedophiles and pedophilia."

In many of the emails that Ms. Smith sent to third parties, she included one or more video snips of her nonconsensual recordings of BRIDGE employees, the Scheduling Conference, and/or the October 31, 2025, hearing. All such video clips are short, not representative of the full conversations/hearings, and were provided with the false context that they prove one or more of Ms. Smith's accusations related to racism, financial impropriety, uninhabitable housing, or pedophilia.

Ms. Smith also appears to have contacted KeyBank. Presumably, Ms. Smith made the same statements to KeyBank that she made to HACLA, NEF, LISC, and Morgan Stanley, among others.

As can be discerned from this small sample, Ms. Smith has made numerous statements that BRIDGE's leaders are racists, unethical, dishonest, incapable of providing safe and habitable housing, misappropriate funds, know nothing about property management, and support pedophiles

and pedophilia. She has stated that BRIDGE knowingly and intentionally underwrites budgets, protects white racists, ignores health and safety problems at its properties, and fires employees for reporting racism. She has communicated these accusations to HACLA, NEF, LISC, Morgan Stanley, KeyBank, Board members, and anyone else she could reach.

Ms. Smith has not provided any evidence that there were incidents of racism and discrimination, health and safety violations, any financial impropriety, pedophilia, or that she was terminated because she reported racism, discrimination, and health and safety violations. None of Ms. Smith's "concerns" appears to be based in fact, and Ms. Smith was not the "stellar, loyal, hardworking, knowledgeable and dedicated employee" that she claims to have been. Disgruntled by her termination, Ms. Smith has chosen to impute to BRIDGE that it was unfit and lacked integrity in its work, then published her false "concerns" to multiple important third parties in order to prejudice the third parties from working with BRIDGE. This is defamation.

While many of the statements were defamatory *per se*, meaning that BRIDGE did not need to present evidence of specific damage, the evidence showed that Ms. Smith's defamation was indeed damaging. BRIDGE relies on steady funding from government entities, tax-exempt bond financing, and low-income tax credits. The market is highly competitive, and BRIDGE must compete for funds and loans with other similar entities. If a bank offers money in bonding, BRIDGE has to raise additional capital, and if it cannot, BRIDGE loses its initial commitment. There are multiple existing and potential projects and funding and lending contingencies being employed and negotiated with the specific entities that Ms. Smith targeted. Accusations of racism, pedophilia, financial impropriety, or uninhabitable housing create a heavy stigma that is not easily shaken. Further, such accusations trigger mandatory inspections, audits, and reporting actions. It is important to maintain good relationships with government entities, lenders, funders, and

investors. Because of Ms. Smith's defamation, BRIDGE has been informed that additional inspections are necessary, and its relationships with the identified third parties have been severely strained.

**Ms. Smith Has Tortiously Interfered with BRIDGE's Business**

Tort claims for wrongful interference with contracts serve as a means of protecting contracting parties against interference in their contracts from outside parties. Economic relations are controlled by contract, and the public also has an interest in maintaining the security of such transactions. Therefore, the law provides protection. To establish a claim for intentional interference with economic relations, BRIDGE needed to prove: (1) the existence of a professional or business relationship (which could include, e.g., a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the relationship or prospective advantage, and (6) damages. *McGanty v. Staudenraus*, 321 Ore. 532, 535, 901 P.2d 841 (1995). "The same elements are applicable to a claim of interference with 'prospective economic advantage.'" *NV Transport*, 302 Ore. App. at 714 review denied, 367 Ore. 75 (2020) quoting *Allen v. Hall*, 328 Ore. 276, 285 (1999); *Thompson v. Telephone Data Systems, Inc.*, 130 Ore. App. 302, 313 n 1 adh'd to as modified on recons, 132 Ore. App. 103 (1994) (liability for interference with a prospective economic relationship arises "when the defendant, without a privilege to do so, induces a third person not to enter into or to continue a business relationship with the plaintiff").

An interference in another party's contractual or other economic relations is tortious only if it is wrongful by some measure beyond the fact of the interference itself, such as by improper means or improper motive. *NV Transport, Inc. v. V&Y Horizon, Inc.*, 302 Or. App. 707, 713 462

P.3d 278, 283 (Or. Ct. App. 2020). Commonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, defamation, or disparaging falsehood. *Top Service Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 210–211, 582 P.2d 1365, 1371 (1978).

BRIDGE has established that it has existing and imminent future projects with HACLA, NEF (and LISC by extension), Morgan Stanley, and KeyBank, as well as relationships with members of its Board and other targets Ms. Smith has identified that she will contact. Ms. Smith is not shy about what her intentions are: to disrupt BRIDGE and force out its leadership to retaliate against them for her termination. Ms. Smith employed improper means to achieve this improper purpose, including "threats [and] intimidation, deceit or misrepresentations, [and] defamation, or disparaging falsehoods." *Top Service Body Shop*, 283 Ore. 201 at n 11 (1978). In addition to defamation of BRIDGE and intimidation of the third parties (and principals of third parties) engaged with BRIDGE, Ms. Smith has also harassed and intimidated a former BRIDGE employee, Marco Ponce. Ms. Smith's harassment was so severe that an Oregon state court granted a Stalking Protective Order against her. *Smith v. Ponce*, Case No. 25SK03677. And, as previously stated, because of Ms. Smith's interference, BRIDGE has been informed that additional inspections are necessary, and its relationships with the identified third parties has been severely strained.

**<u>BRIDGE Did Not Wrongfully Terminate Ms. Smith or Terminate Her in Retaliation for Engaging in Protected Activity</u>**

In her Response and Counterclaim, Ms. Smith toggles back and forth between "claims" plural and "claim" singular, but it appears that she generally asserted a claim for retaliatory termination under Oregon Revised Statute § 659A.199 *et seq.* That statute provides: "It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other

terms, conditions or privileges of employment for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation."

Because Or. Rev. Stat. § 659A.199 was "modeled after Title VII of the federal Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, federal cases interpreting Title VII are instructive." *Harris v. Pameco Corp.*, 170 Or. App. 164, 176, 12 P.3d 524 (2000). When a plaintiff asserts a claim for retaliation under Or. Rev. Stat. § 659A.199 and Title VII, the claims are frequently analyzed in tandem, most commonly under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See e.g., Kirkhart v. Oakridge Sch. Dist.*, 2025 U.S. Dist. LEXIS 104966, *26 (D. Or. 2025).

To establish a prima facie case of retaliation, under Title VII or Or. Rev. Stat. § 659A.199, Ms. Smith needed to demonstrate that: (1) she was engaged in a protected activity; (2) she suffered an adverse action; and (3) there was a causal link between the protected activity and the adverse action. *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 998 (9th Cir. 2017). "The causal link element is construed broadly so that [an employee] merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Kirkhart*, at *26 citing *Poland v. Chertoff*, 494 F.3d 1174, 1181 (9th Cir. 2007). If Ms. Smith could establish a prima facie case, the burden would then shift to BRIDGE to show a legitimate, nonretaliatory reason for the adverse employment action. *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1228 (9th Cir. 2021). "The [employer's] burden is not to persuade but to produce a legitimate, nonretaliatory reason for the adverse employment action." *Kirkhart*, at *26 citing *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1148 (9th Cir. 2006). The burden then returns to Ms. Smith, "who must show that the proffered nonretaliatory reason is pretextual." *Kirkhart*, at *26 citing *Freyd*, 990 F.3d at 1228.

Assuming arguendo Ms. Smith could establish that she engaged in activity protected by the statute, she was not terminated for engaging in such conduct.[3] As explained above, Ms. Smith was not the "stellar, loyal, hardworking, knowledgeable, and dedicated employee," that she claims to have been. Numerous BRIDGE employees and tenants complained that Ms. Smith was aggressive, unnecessarily confrontational, and rude. Ms. Smith was insubordinate and tried to coerce BRIDGE employees to lie and back her campaign to get numerous other BRIDGE employees fired. Ms. Smith committed multiple intrusions of privacy by video and audio recording BRIDGE employees without their consent and by ordering those whom she supervised to spy on other employees. Ms. Smith was warned that she needed to correct her behavior, but she failed to do so. Ms. Smith has not presented any evidence to show a causal link between her alleged protected activity and her termination, therefore failing to establish the prima facie case of retaliation. Even if she had made such a showing, the overwhelming evidence demonstrates that there were numerous legitimate, nonretaliatory reasons for her termination. Ms. Smith did not prove that these reasons were pretextual. Where, as here, the employee fails to show a causal link between her protected activity and her termination, and she fails to show her employer's reasons for termination were pretextual, a claim for retaliation under Or. Rev. Stat. § 659A.199 is without merit. *See e.g.*, *Ochs v. Eugene Emeralds Baseball Club, Inc.*, 774 Fed. Appx. 1026, 1029 (9th Cir. 2019).

Even if Ms. Smith were able to carry her burden to establish the prima facie case of retaliation and prove the reasons for her termination were pretextual, the after-acquired evidence doctrine precludes any recovery. "For a defendant to prevail on an after-acquired evidence theory,

[3] BRIDGE investigated all of Ms. Smith's allegations and took appropriate action pending the results of the investigation.

it must show that 'the wrongdoing was of such a severity that the employee would have been terminated on those grounds alone if the employer had known of it at the time of the discharge.'" *Ewing v. City of Toledo*, 2023 U.S. Dist. LEXIS 235686, *17 (D. Or. 2023) *citing McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362-63, 115 S. Ct. 879 (1995). Here, Ms. Smith falsified her employment references, her employment history, and did not hold the credentials that she claimed to have. BRIDGE never would have hired Ms. Smith had it known these facts, and once discovered, it would have immediately terminated her employment regardless of any alleged protected activity.

**<u>CLAIMANT'S PETITION FOR ATTORNEYS' FEES AND COSTS</u>**

Pursuant to the Judgments issued on November 25, 2025, Claimant was permitted to request fees and expenses by January 9, 2025.

On December 11, 2025, Claimant timely submitted its Petition for Attorneys' Fees and Costs (the "Petition"), seeking attorneys' fees in the amount of $192,587.10 and costs in the amount of $40,216.58.

**<u>Respondent failed to respond to the Petition</u>**

On December 12, 2025, Respondent submitted an Objection to Claimant's Petition for Attorneys' Fees and Costs, arguing "The Claim, itself, submitted August 5, 2025, by William Briggs and Carissa Davis is invalid. The orders submitted on November 25th is unenforceable and invalid. Ms. Smith asks that the petition be denied; and, Claimant's must restore Ms. Smith's employment and immediately pay all backpay of salaries unpaid since the date of wrongful termination, and provide a minimum of two years of employment with annual reviews conducted by an independent review board; OR, provide three (3) years' worth of salary and bonuses totaling $325,000.00 in actual and compensatory damages; and punitive damages in the amount of $2,000,000.00. Every order entered by Retired Judge Trapp is unenforceable and invalid. …"

Respondent failed to respond to Claimant's request for attorneys' fees and costs in any meaningful way. She did not object to the amount of fees and costs, the bases for those fees and costs, or the appropriateness of awarding them. Instead, Respondent based her Objection solely on her belief that the "Claim"—by which she appears to refer to the arbitration itself—and all orders issued therein are "unenforceable and invalid." Where a party fails to respond to an argument, that party therefore concedes it through silence. See, Jenkins v. County of Riverside, 398 F.3d 1093 (2005), Bonte v. U.S. Bank, N.A., 624 F.3d 461 (2010), (Moore v. Davis, 684 F.Supp.3d 813 (2023), (Portland General Electric Company v. Oregon by and through Oregon Department of State Lands, 2025 WL 27252 (2025)

**Authority to Award Fees and Costs Under JAMS Rule 29**

JAMS Rule 29 provides:

> The Arbitrator may order appropriate sanctions for failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator. These sanctions may include, but are not limited to, assessment of Arbitration fees and Arbitrator compensation and expenses; any other costs occasioned by the actionable conduct, including reasonable attorneys' fees, exclusion of certain evidence; drawing adverse inferences; or, in extreme cases, determining an issue or issues submitted to Arbitration adversely to the Party that has failed to comply.

In issuing the Judgments and Permanent Injunction in this case, the Arbitrator found this to be an extreme case warranting the award of reasonable attorneys' fees and costs. Claimants were permitted to request costs and fees, including "any and all amounts BRIDGE has incurred in connection with the case." See November 24, 2025 Order.

**Lodestar Analysis and Reasonableness of Fees**

Claimant based its Petition on the lodestar method, "which is the number of hours reasonably expended multiplied by a reasonable hourly rate." Gates v. Deukmejian, 987 F.2d 1392, 1397 (9th Cir. 1992). Claimant "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley v. Eckerhart, 461 U.S. 424, 437 n.12 (1983).

After reviewing the Petition, Exhibits, and Declaration, the Arbitrator finds that Claimant's hourly rates are reasonable and that the number of hours expended is reasonable. Claimant could have requested "all amounts [it] has incurred in connection with the case." It did not. Instead, the Petition reflects that Claimant's counsel worked at reduced hourly rates, utilized

minimal but sufficient staffing, and that Mr. Briggs, lead counsel, voluntarily wrote off 30 hours of work.

These factors support the reasonableness of the requested award. Accordingly, Claimant's Petition for Attorneys' Fees and Costs, seeking attorneys' fees in the amount of $192,587.10 and costs in the amount of $40,216.58, is granted.

**JUDGMENT**

For the reasons explained, and in the Arbitrator's prior order dated November 25, 2025, JUDGEMENT is entered as follows:

1. Judgment is granted in favor of BRIDGE and against Respondent Addie Smith on BRIDGE's defamation and tortious interference claims.
2. Judgment is granted in favor of BRIDGE and against Respondent Addie Smith on her "Counterclaim pursuant to Or. Rev. Stat. § 659A.199."
3. The Permanent Injunction detailed above remains in effect.
4. BRIDGE is awarded attorneys' fees in the amount of $192,587.10 and costs in the amount of $40,216.58. All amounts are subject to 9% interest in accordance with Or. Rev. Stat. § 82.010. Payment shall begin immediately.

This Award resolves all claims between the parties submitted for decision in this Arbitration.

Dated: 12/24/2025

Randa Trapp

Judge Randa Trapp (Ret.) Arbitrator