**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **BRIDGE HOUSING CORPORATION,** | **Case No.: 3:25-cv-2439-SI** |
| **Plaintiff,** | |
| **v.** | **FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ORDER OF CONTEMPT** |
| **ADDIE SMITH,** | |
| **Defendant.** | |

Before the Court is Plaintiff BRIDGE Housing Corporation's Motion for an Order to Show Cause Regarding Defendant Addie Smith's ("Ms. Smith") Contempt of Court for Violating the Injunction (ECF 21) ("Motion"). BRIDGE Housing Corporation ("BRIDGE") filed the Motion, its exhibits (ECF 21-1 and ECF 21-2), the supporting Declaration of Ken Lombard (ECF 23), and the supporting Declaration of Carissa Davis with exhibits (ECF 22) on March 17, 2026. Although Ms. Smith appears to have received notice of this Motion and a fair opportunity to be heard, Ms. Smith did not file a response to the Motion. Having considered the Motion, the evidence submitted, the record in this matter, and the applicable law, and good cause appearing, the Court FINDS and ORDERS as follows:

1

FINDINGS OF FACT AND
CONCLUSIONS OF LAW ON
ORDER OF CONTEMPT

Case No.: 3:25-cv-2439-SI

## I.    STANDARDS

A court has the inherent power to enforce compliance with its orders through civil contempt proceedings. *Shillitani v. United States*, 86 S. Ct. 1531 (1966). Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) (quoting *In re Dual—Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)). The contempt need not be willful to be actionable. *In re Dual-Deck*, 10 F.3d at 695. If a party is disobedient to a court order, there is no "good faith" exception. *Id.*

"The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." *In re Dyer*, 322 F.3d 1178, 1190–91 (9th Cir. 2003) (citation omitted). "The sole question is whether a party complied with the district court's order." *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983). If the movant demonstrates noncompliance, the burden shifts to the party alleged to be in contempt to demonstrate that they were unable to comply with the court order. *Id.*

"Because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required" than for criminal contempt sanctions. *United States v. Ayres*, 166 F.3d 991, 995 (9th Cir. 1999) (citation omitted). Accordingly, "civil contempt may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Id.* (internal citation and quotation marks omitted). "Neither a jury trial nor proof beyond a reasonable doubt is required." *Id.* (citation omitted).

The purpose of civil contempt proceedings is "to compel obedience to a court order or to compensate the contemnor's adversary for the injuries which result from the noncompliance."

2

*United States v. Bright*, 596 F.3d 683, 695–96 (9th Cir. 2010) (citation omitted). There are two forms of civil contempt sanctions: compensatory and coercive. *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983).

Compensatory sanctions compensate the aggrieved party for "actual loss" resulting from the contemnor's noncompliance. *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1366 (9th Cir. 1987). Coercive sanctions are "intended to coerce the contemnor to comply with the court's orders in the future" and are therefore conditioned upon the contemnor's continued noncompliance. *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1481 (9th Cir. 1992). Thus, when imposing a coercive civil contempt sanction, a court must provide a "subsequent opportunity to reduce or avoid the fine through compliance." *Int'l Union United Mine Workers of Am. v. Bagwell*, 114 S. Ct. 2552 (1994). When evaluating coercive sanction, a court must "consider the character and magnitude of the harm threatened by continued contumacy," as well as the sanction's probable effectiveness. *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992) (citations omitted). "Appropriate civil contempt sanctions may include a coercive daily fine, coercive incarceration, or a compensatory fine for actual losses or attorneys' fees and costs resulting from the improper behavior." *United States v. Wiley*, No. 2:17-cv-00426-SU, 2018 U.S. Dist. LEXIS 224142, 2018 WL 6920118, at *3 (D. Or. Oct. 31, 2018) (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304, 67 S. Ct. 677 (1947) and *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1147–49 (9th Cir. 1983)).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

Although BRIDGE's Motion concerns Ms. Smith's contempt of an Order of the Court, because Ms. Smith has demonstrated consistent disregard of arbitral and judicial authority and BRIDGE has been required repeatedly to seek injunctive relief for the same conduct addressed in its Motion, this decision includes an abbreviated recitation of the relevant factual and procedural

history. A more complete summary of the facts and procedural history is set forth in the Amended Final Arbitration Award filed at ECF 1-1, which became an Order of the Court by virtue of the Order Confirming the Arbitration Award at ECF 20 and as confirmed in the Final Judgment at ECF 24.

a.    **The Underlying Arbitration Action and Final Arbitration Award**

BRIDGE creates safe, healthy, and affordable housing, offering a range of multifamily housing communities. ECF 1-1 at 2–3. Ms. Smith worked for BRIDGE for approximately three (3) weeks before her employment was terminated for cause. *Id.* Immediately after her termination, Ms. Smith began to disseminate dozens of inflammatory and categorically false statements about BRIDGE, including about specific members of its leadership. *Id.* Her false statements are among the most serious imaginable, including baseless accusations of racism and abuse, and, most recently, pedophilia.

Ms. Smith contacted BRIDGE's funders, lenders, board members, and government housing partners to force them to stop doing business with BRIDGE. *Id.* at 12–13. In doing so, she made highly inflammatory statements about BRIDGE's Chief Executive Officer, Ken Lombard, BRIDGE's former Chief Financial and Operating Officer, Delphine Sherman, and members of BRIDGE's Board of Directors. *Id.* at 14–15. In her excessive and harassing communications, Ms. Smith falsely stated that BRIDGE was a racist organization, that the organization and its leadership were lining their own pockets and engaging in financial impropriety, that BRIDGE operated unsafe and uninhabitable housing, that BRIDGE exploited "Black and Brown" workers, who were allegedly "terrified" from the tyranny, and finally, that BRIDGE fired her for reporting discrimination and health-and-safety violations. *Id.* at 15–21.

BRIDGE initiated arbitration against Ms. Smith and asserted claims for Tortious Interference with Economic Relations, Defamation (Libel and Slander), and for Injunctive

Relief. *Id.* at 4. BRIDGE sought, among other things, a temporary restraining order and preliminary and permanent injunctive relief precluding Ms. Smith from interfering with and defaming BRIDGE. *Id.* The arbitration was conducted under the JAMS Employment Arbitration Rules & Procedures ("JAMS Rules"), and the Honorable Randa Trapp (Ret.) presided over the matter. *Id.*

In the arbitration, BRIDGE filed a Motion for Temporary Restraining Order and Preliminary Injunction. *Id.* at 5–6. Arbitrator Trapp held a hearing on the merits of that motion, at which Ms. Smith had full and fair opportunity to present her opposition. *Id.* Ms. Smith presented her "evidence" and articulated her arguments explaining why she believed an injunction was not warranted. *Id.* Although Ms. Smith denied that her conduct was unlawful, she did not deny that she had contacted numerous third parties to try to force them to stop doing business with BRIDGE. *Id.* Ms. Smith also did not deny making highly inflammatory and defamatory statements about BRIDGE and its leadership to achieve her desired ends. *Id.* While Ms. Smith did not deny taking the actions at issue, she presented what she believed to be evidence proving that her statements about BRIDGE were true. *Id.* That evidence was "woefully deficient." *Id.*

After evaluating the evidence, Arbitrator Trapp entered an Order granting BRIDGE's Motion for Temporary Restraining Order and Preliminary Injunction (the "Preliminary Injunction"). ECF 1-6 at 6. Arbitrator Trapp determined that BRIDGE was likely to succeed on the merits of its claims for defamation and tortious interference, it would suffer imminent irreparable harm if Ms. Smith was not enjoined, the equities tipped in BRIDGE's favor, and there was "no public interest in allowing Ms. Smith to continue to harass, intimidate, and defame Bridge." *Id.* at 5–12. The Arbitrator, therefore, entered the following Preliminary Injunction:

Respondent Addie Smith is enjoined from taking any action, directly or indirectly, that is intended to or has the effect of interfering with BRIDGE's business relationships through defamatory statements or otherwise. Specifically, Ms. Smith shall cease and desist from contacting third parties to the extent such contact involves prohibited statements about BRIDGE.

Third parties include but are not limited to all of BRIDGE's current and prospective funders, donors, lenders, housing authorities, general contractors, subcontractors, oversight agencies and commissions, and other entities with whom BRIDGE transacts business. Third parties include individuals who are employed by, sit on the Boards of, or are affiliated with any of the foregoing third parties.

Prohibited statements include, but are not limited to, those which are designed to, or have the effect of, discouraging the third party from entering into or continuing its relationship with BRIDGE.

Statements are about BRIDGE if the reasonable listener would believe they relate to the company itself or BRIDGE's leadership or employees acting in their capacity as such.

This Order shall remain in effect until a final judgment on the merits is rendered.

*Id.* at 12–13; *See also* ECF 1-1 at 7–8.[1]

Ms. Smith immediately proclaimed that she would not abide by the Preliminary Injunction or any of the Arbitrator's other orders. ECF 1-1 at 8. Since the very moment the Preliminary Injunction was issued in November 2025, Ms. Smith has only intensified her interference and defamation, and she has consistently exhibited her utter disregard for the rule of law by repeatedly making statements that are undeniably defamatory and clearly designed to wrongfully interfere with BRIDGE's business. *Id.* at 17–21. In the Arbitration, Ms. Smith was repeatedly warned that her continued violation of the Preliminary Injunction and the Arbitrator's other orders would result in serious sanctions. *Id.* at 8.

Ms. Smith was recalcitrant, and she unapologetically proclaimed she would never comply with the Arbitrator's orders, including the Preliminary Injunction. *Id.* Ms. Smith continued to egregiously defame BRIDGE and its principals, attempted to coerce decisionmakers

---

[1] Statements that are covered by the various injunctions are referred to in this Order as "Prohibited Statements."

and third parties to end their relationships with BRIDGE, and in direct violation of the Arbitrator's numerous orders, she distributed out of context snippets of nonconsensual recordings that she made of various arbitration proceedings. *Id.*

BRIDGE filed three (3) separate Notices of Injunction Violations (dated November 10, 2025, November 11, 2025, and November 17, 2025) and a fourth Notice of Supplemental Evidence (dated November 24, 2025). *Id.* Ms. Smith's defamation of BRIDGE was obvious, and she continued to make many of the same false statements that were explicitly identified as defamatory in the Preliminary Injunction. *Id.* at 7, 12–20. Ms. Smith admitted that she made the statements and that she did so for the purpose of forcing third parties to stop doing business with BRIDGE and to force specific members of BRIDGE's management, primarily Mr. Lombard, to resign. *Id.* at 22.

A hearing on Ms. Smith's repeated violations of the Preliminary Injunction and Arbitrator's other orders was held on November 24, 2025. *Id.* at 9. Ms. Smith was aware of the hearing but proclaimed she would no longer participate in the Arbitration. *Id.*

Based on BRIDGE's four (4) Notices, the evidence presented, and the proceedings, including Ms. Smith's emphatic proclamations that she would not comply with the Arbitrator's orders and that she would no longer participate in the Arbitration, the Arbitrator determined this was an "extreme case" under JAMS Rule 29, and she entered judgment in favor of BRIDGE and the following Permanent Injunction, which tracked the Preliminary Injunction:

> Respondent Addie Smith is enjoined from taking any action, directly or indirectly, that is intended to or has the effect of interfering with BRIDGE's business relationships through defamatory statements or otherwise. Specifically, Addie Smith shall cease and desist from contacting third parties to the extent such contact involves prohibited statements about BRIDGE;
>
> Third parties include but are not limited to all of BRIDGE's current and prospective funders, donors, lenders, housing authorities, general contractors, subcontractors, oversight agencies and commissions, and other entities with whom BRIDGE transacts business. Third parties include individuals who are

7

employed by, sit on the Boards of, or are affiliated with any of the foregoing third parties;

Prohibited statements include, but are not limited to, those which are designed to, or have the effect of, discouraging the third party from entering in to or continuing its relationship with BRIDGE.

Statements are about BRIDGE if the reasonable listener would believe they relate to the company itself or BRIDGE's current or former leadership, or employees acting in their capacity as such. For the avoidance of doubt, BRIDGE's leadership and/or employees includes but is not limited to Ken Lombard, Delphine Sherman, Sierra Atilano, Rebecca Hlebasko, Jen Nelson, Nancy Nelson, Kira Bogle, Marco Ponce, Karen Felix, Chris Felix, and Sarah Buck.

*Id.*

On December 24, 2025, the Arbitrator issued a comprehensive Final Arbitration Award in which she entered judgment in favor of BRIDGE and against Ms. Smith on BRIDGE's claims for defamation and tortious interference and on Ms. Smith's counterclaim of wrongful termination. ECF 1-1 at 1. BRIDGE was awarded attorneys' fees in the amount of $192,587.10 and costs in the amount of $40,216.58. *Id.* at 27. The Arbitrator made clear that the Permanent Injunction remained in effect. *Id.* It was this Final Arbitration Award that was ultimately entered as an Order of the Court in ECF 20 and as a Final Judgment of the Court in ECF 24.

### b.    The Court's Temporary Restraining Orders and Confirmation and Enforcement of the Arbitration Award

On December 30, 2025, BRIDGE filed with the Court its Petition to Confirm and Enforce the Final Arbitration Award (the "Petition"). ECF 1. On January 8, 2026, Ms. Smith was served with the Petition. ECF 11. BRIDGE also served the service packet to Ms. Smith's numerous email addresses. ECF 22 at ¶ 2; (Aslm0812@icloud.com, absm6929@gmail.com, absmith27@icloud.com, rejoicezion00@gmail.com, addiesmith@houstonrr.com). BRIDGE's counsel also served the service packet through the JAMS Access Portal, which Ms. Smith actively used throughout Arbitration. *Id.*

8

While the Petition was pending, BRIDGE learned that Ms. Smith continued to violate the Permanent Injunction. ECF 12-2. Among many other third parties, Ms. Smith targeted the National Equity Fund ("NEF"), which is one of BRIDGE's largest funders, and its parent company, LISC National. *Id.* Ms. Smith made the following false statements, which were clearly and unequivocally Prohibited Statements under the Preliminary and Permanent Injunctions:

1.     BRIDGE "is not providing safe and habitable housing";

2.     "[T]he properties are failing federal and state inspections";

3.     "The budgets are intentionally underwritten. Properties are intentionally underfunded";

4.     "The grants, loans and donations being provided to Bridge Housing are not 'bridging the wealth gap'";

5.     Mr. Lombard has set his own compensation and has received a salary and bonuses that he has "done absolutely nothing to earn";

6.     If Mr. Lombard "can use funding to increase his salary from $500k+ to $1.5 Million+ and $50k -$60k bonuses then he could use that money to maintain the properties and actually bridge the wealth gap he lied about trying to do";

7.     "[O]nsite staff aren't earning a living wage" but Mr. Lombard has "paid other corporate employees in excess of over $200k annually";

8.     "African American employees are being referred to as 'n-----s' and 'monkeys'";

9.     Mr. Lombard and Delphine Sherman "have been protecting White racist committing [] horrible acts";

10.     Mr. Lombard as a Black man has allowed racism and uninhabitable housing; and

11.     BRIDGE and its attorneys are submitting "such filth" regarding "disgusting pedophiles" to the Arbitration.

ECF 12-2; ECF 12-3 at ¶ 3.

When NEF did not immediately succumb to Ms. Smith's demands to terminate their relationship with BRIDGE, Ms. Smith extorted NEF by threatening that she would make many

of the same accusations against NEF, including, among other things, accusations of financial impropriety and support of racism and pedophilia. Ms. Smith then threatened to hold them "accountable," just as she alleged that she was doing with BRIDGE. *Id.* The threat was thinly veiled, and the message was clear: "cut ties with BRIDGE or I will publicly proclaim you are a racist organization engaged in financial impropriety and supportive of pedophilia." Ms. Smith has sent dozens of emails and voicemails to other third parties that contain the same or substantially similar Prohibited Statements. *Id.* at ¶¶ 2–3.

After BRIDGE effected service of the Petition, Ms. Smith again contacted NEF, LISC, Community Preservation Corporation, and, according to Ms. Smith's letter, she "BCC'd" Fannie Mae, Freddie Mac, USDA, HUD, State Housing Authorities, and others. ECF 12-4. In her cover email, Ms. Smith falsely stated that BRIDGE and NEF were perpetrating a "Ponzi scheme" and that Mr. Lombard sets his own salary, is engaged in financial impropriety, and that Ms. Sherman "knows absolutely nothing about property management." *Id.* In her attached letter, Ms. Smith went on to falsely state that BRIDGE is misusing property funds, is not subject to any oversight, "intentionally" underwrites budgets, and that BRIDGE's leadership is misappropriating BRIDGE's funding to line their own pockets. *Id.* A few days later, Ms. Smith used an alias account (BStudios <b43847219@gmail.com>) and sent a nearly identical cover email and letter to over thirty (30) new recipients. ECF 13-1.[2] BRIDGE then filed with the Court an *Ex Parte* Motion for Temporary Restraining Order. ECF 12.

---

[2] According to Ms. Smith, the recipients included the Illinois Housing Development Authority: Kristin Faust, Executive Director and Karen Davis, Deputy Executive Director; Chicago Housing Authority: Matthew Brewer, Operating Chairman, Kemena Brooks, Chief of Staff, Cheryl Burns, Chief Housing Choice Voucher Officer; Fannie Mae: Peter Akwaboah, Acting CEO; United States Department of Housing and Urban Development: Scott Turner, HUD Secretary, Frank Cassidy, Assistant Secretary for the Office of Housing and the Federal Housing Authority Commissioner, Irving Dennis, Principal Deputy Chief Financial Officer; Freddie Mac: Kenny Smith, CEO, Mike Hutchins, President; USDA Rural Housing Service: Todd Lindsey, Acting Under Secretary, Christine Mechtly, Acting Administrator, Karissa Stiers, Acting, Dep. Admin. Multifamily Housing; Governor JB Pritzker; National Governor's Association; Chicago Mayor Brandon Johnson. ECF 13-1.

On February 6, 2026, the Court granted BRIDGE's Motion and entered a Temporary Restraining Order ("TRO"). ECF 16. The TRO substantively tracked the Permanent Injunction. *Compare Id.* and ECF 1-1 at 9. The Court found that BRIDGE demonstrated a likelihood of success on the merits, including confirmation and enforcement of the Arbitration Award (which contains the Permanent Injunction), that BRIDGE would suffer immediate and irreparable harm absent relief, and that the balance of equities and public interest favor injunctive relief. *Id.*

On February 10, 2026, Counsel for BRIDGE served the Temporary Restraining Order on Ms. Smith via Certified Mail and to Ms. Smith electronically to her numerous email addresses (Addie Smith <absmith27@icloud.com>; Abbie Smith <absm6929@gmail.com>; Blank <aslm0812@icloud.com>; Addie Smith <absmith27@icloud.com>; rejoicezion00@gmail.com; addiesmith@houstonrr.com.). ECF 22 at ¶ 3.

On February 20, 2026, the Court entered an order Extending the TRO through March 6, 2026. ECF 19. The next day, Counsel for BRIDGE notified Ms. Smith of the extension by sending it to Ms. Smith's numerous email addresses. ECF 22 at ¶ 4. On Friday March 13, 2026, at approximately 12:00 p.m. (PT), the Court entered an Order confirming the Arbitration Award in its entirety. ECF 20. By Confirming the Arbitration Award, the Permanent Injunction became an Order of the Court ("Confirmed Permanent Injunction").

### c.    Ms. Smith Violates the Court's Confirmed Permanent Injunction

On March 13, 2026, at approximately 2:40 p.m. (PT), counsel for BRIDGE emailed Ms. Smith the Court's Order confirming the Arbitration Award. ECF 22 at ¶ 5 ECF 22. As had been custom, Counsel sent the order to Ms. Smith's numerous email addresses. *Id.* Less than thirty (30) minutes later, Ms. Smith violated the Confirmed Permanent Injunction, and she continued to do so throughout the weekend.

At 3:07 p.m. (PT), Ms. Smith responded to a CBS LA post honoring news anchor Pat Harvey. ECF 22 ¶ 6; ECF 22-3. This was not done at random; Ms. Harvey is Mr. Lombard's wife, and Ms. Smith posted numerous comments on the CBS LA post making false statements that clearly and unambiguously fall within the definition of Prohibited Statements. *Id.*; ECF 23 at ¶¶ 2–3.

Ms. Smith posted a photograph of Mr. Lombard, Kenneth Novack (member of BRIDGE's Board), and Daryl Carter, the Chief Executive Officer of a company with whom BRIDGE transacts significant business. ECF 22 at ¶ 5; ECF 22-3. ECF 23 at ¶¶ 9–10. Ms. Smith set the stage for her coming onslaught of Prohibited Statements: "The man on the left is the husband of CBSLA anchor #PatHarvey. He is CEO of Bridge Housing, Ken Lombard. Next to him is board president Ken Novack and on the left is CEO and Founder of Avanath, Daryl J. Carter. Bridge Housing is an Affordable Housing Nonprofit." *Id.*

Three minutes later, Ms. Smith responded to the chain by making the Prohibited Statement that BRIDGE is engaged in financial impropriety by virtue of Mr. Lombard setting his own compensation and lining his and the corporate staffs' pockets with BRIDGE's funds while "lower level employees doing the work can't pay their bills/receive no bonuses." ECF 22 at ¶ 6; ECF 22-4.

The next day, on March 14, 2026, at approximately 9:00 a.m. (PT), Ms. Smith violated the Confirmed Permanent Injunction again by making the same false statements regarding financial impropriety, but this time she reposted the photo of Mr. Lombard, Mr. Novack, and Mr. Carter. ECF 22 at ¶ 6; ECF 22-5.

A few minutes later, Ms. Smith responded again, tagged Ms. Harvey's handle, and wrote, "[i]n this photo is @Patharveynews' husband, Ken Lombard. He's CEO of Bridge Housing, an

affordable housing nonprofit. He allowed his white racist supervisors to create a horrible, toxic, racist and discriminatory work environment for onsite Black and Brown employees (Lombard on left)." ECF 22 at ¶ 6; ECF 22-6.

Two (2) minutes later, Ms. Smith replied to the post again, stating that "Harvey's husband knowingly allowed White supervisors to take Black employees on a 'surprise mandatory fieldtrip' by bus to listen to a KKK member speak. The White Supervisors told Hispanic employees 'jokes' like, 'I heard ICE was looking for you. I hope you have your papers.'" ECF 22 at ¶ 6; ECF 22-7.

A few minutes later, Ms. Smith replied again, identifying the "White guy in the middle" as "Kenneth Novak [*sic*], the president of the board at Bridge Housing." ECF 22 at ¶ 6; ECF 22-8. Ms. Smith went on to falsely state that "[Mr. Novak] and Lombard along with Delphine Sherman fired the Black woman 'whistleblower.' Launched a 'Trumpesque' attack on her for exposing that they knew what was happening." *Id.* Presumably, the "Black woman" referenced in the post is Ms. Smith referring to herself, albeit through the pseudonym account "Scooter Ames," which is addressed in greater detail below.

Another two (2) minutes passed, and Ms. Smith responded to the post again, repeating the Prohibited Statement that Mr. Lombard lined his own pockets with BRIDGE's funds. ECF22 at ¶ 6; ECF 22-9. Ms. Smith continued to leverage Ms. Harvey's standing in the public to project her claims by invoking Ms. Harvey's name and by linking Ms. Harvey's news station— #CBSLA—"Harvey's husband had his attorneys use a pedophile case that the Black Woman filed against a previous landlord from over 10 years ago to attempt to discredit her." *Id.*

13

## III.    DISCUSSION[3]

### a.    The Confirmed Permanent Injunction Is a Definite Order of the Court

There can be no genuine dispute that the Permanent Injunction became an Order of the Court (hereafter referred to as the "Confirmed Permanent Injunction") when the Court entered its Order Confirming the Final Arbitration Award. ECF 20. The language of the Confirmed Permanent Injunction is unambiguous, and it clearly identifies the conduct that is prohibited by the injunction.

### b.    BRIDGE Established, By Clear and Convincing Evidence, that Ms. Smith is the Person Operating the Scooter Account

BRIDGE established that Ms. Smith is the one behind the account "@scooter_ames" (the "Scooter account"), which is the account used to make the posts described above. ECF 22 at ¶ 6.

First and foremost, the operator of the Scooter account stated that they were Addie Smith, as demonstrated in the November 2023 post submitted at ECF 22-10 ("My name is Addie Smith."). Moreover, the operator of the Scooter account posted several videos that Ms. Smith recorded of herself, including a video taken as recently as March 14, 2026. *See* ECF 22 at ¶ 6; ECF 22-11. Mr. Lombard attested that he recognized Ms. Smith from the video. ECF 23 at ¶¶ 6–7. The cover art of the Scooter account also includes an illustration of a woman who resembles Ms. Smith in the video. ECF 22 at ¶ 6; ECF 22-14.

The operator of the Scooter account appears to have used the first person grammatical feature when speaking about Ms. Smith and her experiences. When addressing an incident at Mercer Island involving Ms. Smith, the operator of the Scooter account used the first person when speaking about Ms. Smith's alleged experience, stating, "Tana Senn [then a member of the

---

[3] The court construes BRIDGE's Motion as a motion for an order holding Defendant Addie Smith in contempt. *GRK Fasteners, Ltd. v. Bennett*, 2004 U.S. Dist. LEXIS 10476, *1 (D. Or. May 14, 2004) (construing motion for order to show cause as a motion for order holding defendant in contempt and granting such motion).

Washington state House of Representatives] is a disgusting white racist who ignored the hate crimes that happened to ***my daughter and I*** on Mercer island... Justice for Addie smith!" ECF 22 at ¶ 6; ECF 22-12 at 1 (emphasis added).[4]

The content of the Scooter account is devoted to wrongs that Ms. Smith and her family members have allegedly suffered. The account repeatedly calls for "Justice for Addie Smith" or seeks to raise awareness about alleged wrongs Ms. Smith's son, Jalen Smith, has suffered. ECF 22 at ¶ 6; ECF 22-13; ECF 11 (affidavit of service identifying "Jalen Bajajuan Nazedeky Smith" as Ms. Smith's adult son and co-occupant of her apartment). The account also includes what appear to be near verbatim statements that Ms. Smith has made in connection with this case. *See e.g.*, ECF 21-1 ("I've attached photos from staff who were forced to go on a field trip to hear a KKK member speak…. Mr. Lombard should have been outraged that these things were happening under his leadership and to Black and Brown people no less."); ECF 22-2 ("The onsite staff of Black and Brown people are terrified."); ECF 12-2 ("I haven't started talking to media yet. But, I'm going to do exactly that. [Named Representative of NEF] and everyone involved with fattening Mr. Lombard's pockets while properties suffer will be held accountable. If he can use funding to increase his salary from $500k+ to $1.5 Million+ and $50k -$60k bonuses then he could use that money… pay the onsite staff, at these properties, a living wage.").

Ms. Smith has used pseudonyms and different accounts in the past to make Prohibited Statements. *See e.g.* ECF 13-3 (BStudios b43847219@gmail.com); ECF 12-4 ("Blank" <aslm0812@icloud.com>). Therefore, it would not be surprising if the Scooter account was yet another account or pseudonym used by Ms. Smith.

---

[4] According to the Scooter account, the "Mercer Island incident" was when "Addie Smith was arrested by @MercerIslandPD after defending her life from death in a hate crime attack." ECF 22 at ¶ 6; ECF 22-12 at 2.

Finally, it does not appear to be a coincidence that literally within minutes of BRIDGE's counsel's email notification to Ms. Smith providing her with the Court's Order Confirming the Arbitration Award, the Scooter account lit up with anti-BRIDGE content. The evidence shows that Ms. Smith has a well-established pattern of lashing out the moment she is notified of an adverse order. ECF 1-8 (entries dated on or immediately following November 4 and 10, 2025 (entry of Preliminary Injunction and amended Preliminary Injunction), November 24, 2025 (entry of Permanent Injunction), December 23 and 24 (entry of Final Arbitration Award and amendment to the same)). It is, therefore, unsurprising that Ms. Smith would do the very same thing here, just moments after the Court entered the Order Confirming the Arbitration Award.

### c.    Ms. Smith's Posts on the Scooter Account Violate the Confirmed Permanent Injunction

The Confirmed Permanent Injunction prohibits Ms. Smith from taking the actions that she took through the Scooter account. Ms. Smith is clearly and unequivocally "enjoined from taking any action, directly or indirectly, that is intended to or has the effect of interfering with BRIDGE's business relationships through defamatory statements or otherwise." ECF 1-1 at 9. The Confirmed Permanent Injunction does not carve out social media posts from the ambit of conduct that is prohibited, nor does it limit "statements" to those made by Ms. Smith verbally and in person. *Id.* Rather, the Confirmed Permanent Injunction covers written and spoken word. *Id.*

The Confirmed Permanent Injunction prohibits Ms. Smith from "contacting third parties to the extent such contact involves prohibited statements about BRIDGE." *Id.* The statements about Mr. Lombard, Mr. Novack, and Ms. Sherman are statements about BRIDGE, because as recognized in the Confirmed Permanent Injunction, "[s]tatements are about BRIDGE if the reasonable listener would believe they relate to the company itself or **BRIDGE's leadership or**

16

**employees** acting in their capacity as such" and "[f]or the avoidance of doubt, BRIDGE's leadership and/or employees includes but is not limited to **Ken Lombard, Delphine Sherman…..**" *Id.* (emphasis added).

In the Scooter account posts, Ms. Smith identified Mr. Lombard, Mr. Novack, and Ms. Sherman specifically in their official capacities with BRIDGE, then went on to explain all the horrible things they had allegedly done to employees of BRIDGE or with respect to the company's finances. ECF 22-4. (stating that Mr. Lombard "lined the pockets of [BRIDGE's] corporate staff… [m]eanwhile, [BRIDGE's] lower level employees doing the work can't pay their bills/receive no bonus."); ECF 22-8 (stating that Mr. Novack, Mr. Lombard, and Ms. Sherman "fired the Black woman 'whistleblower'. Launched a 'Trumpesque' attack on her for exposing that they knew what was happening."); ECF 22-6 (stating that Mr. Lombard "allowed [BRIDGE's] white supervisors to create a horrible, toxic, racist and discriminatory work environment for onsite Black and brown employees.").

To the extent there was any confusion over who Mr. Lombard and Mr. Novack were, Ms. Smith took care of that by posting photographs of the men and specifically explaining who they were. ECF 22-3 ("the man on the left… is CEO of Bridge Housing, Ken Lombard. Next to him is the board president, Ken Novack… Bridge Housing is an affordable housing nonprofit."). Even if the Confirmed Permanent Injunction did not expressly explain that statements about Mr. Lombard and Ms. Sherman are being imputed to BRIDGE for the purposes of the injunction, the reasonable viewer of the posts would know that Ms. Smith's statements were about BRIDGE. *See e.g., Rajneesh Foundation International v. McGreer*, 303 Ore. 371, 374 (1987) (explaining the following statement may constitute defamation of the organization with which the specific individuals are affiliated "Rosemary McGreer, Donna Smith Quick, Robert Anderson, Diane

McDonald, Bill Driver, Wil Phinney, Don Smith, Loren Reynolds, Mardo Jimenez, Barbara Hill and all of those insolent racists and religious bigots who go around the state -- supported by Senator Mark Hatfield and a few government bureaucrats -- spreading fear through outrageous lies and biased opinions should understand one thing: this atmosphere of violence and threats is your offspring.").

With respect to the content of the posts, Ms. Smith's statements on the Scooter account are substantially similar to many of the same statements that the Arbitrator found violated the Preliminary and Permanent Injunctions, which of course prohibit the same statements and conduct covered by the Confirmed Permanent Injunction. *See e.g.,* ECF 1-1 at 7 ("Immediately after the Preliminary Injunction was issued, Ms. Smith proclaimed that she would not abide by the Preliminary Injunction… [and she] went on a tirade, egregiously defaming BRIDGE and its principals, attempting to coerce decisionmakers and third parties to end their relationships with BRIDGE."); *Id.* at 8 (certifying that Ms. Smith violated the Preliminary Injunction).

While Ms. Smith's statements and conduct need not rise to the level of defamation or tortious interference to violate the Confirmed Permanent Injunction, Ms. Smith has already been put on notice that statements substantively similar to those made on the Scooter account constitute actionable defamation. Indeed, as explained by the Arbitrator:

> [A]fter Ms. Smith was terminated, she began an online campaign accusing BRIDGE of racism, financial impropriety, incompetence, support of pedophilia, as well as falsely reporting that she was wrongly terminated for reporting these issues and health and safety violations. Most of the communications involve the same "concerns" about BRIDGE executives being racist, supporting pedophilia, being financially incompetent, failing to provide adequate housing, misappropriating funds, or otherwise being led by greed and lining their own pockets….
>
> As can be discerned from this small sample, Ms. Smith has made numerous statements that BRIDGE's leaders are racists, unethical, dishonest, incapable of providing safe and habitable housing, misappropriate funds, know nothing about property management, and support pedophiles and pedophilia. She has stated that BRIDGE knowingly and intentionally underwrites budgets, protects white racists,

18

> ignores health and safety problems at its properties, and fires employees for reporting racism... Ms. Smith has not provided any evidence that there were incidents of racism and discrimination, health and safety violations, any financial impropriety, pedophilia, or that she was terminated because she reported racism, discrimination, and health and safety violations. None of Ms. Smith's "concerns" appears to be based in fact....
>
> Disgruntled by her termination, Ms. Smith has chosen to impute to BRIDGE that it was unfit and lacked integrity in its work, then published her false "concerns" to multiple important third parties in order to prejudice the third parties from working with BRIDGE. This is defamation.

ECF 1-1 at 13–14, 19–20.

Even if the *language* of the posts did not violate the Confirmed Permanent Injunction, the *purpose and effect* of the language brings the posts within the ambit of the injunction. The Scooter account posts are clearly "designed to, or have the effect of, discouraging" third parties from entering into or continuing their relationship with BRIDGE. ECF 1-1 at 8. Indeed, "Ms. Smith is not shy about what her intentions are: to disrupt BRIDGE and force out its leadership to retaliate against them for her termination." ECF 1-1 at 22. Ms. Smith has proclaimed that she will achieve these goals by disregarding the injunctions and continuing to contact all of BRIDGE's donors, funders, business partners, and other third parties. ECF 1-8 at 3 ("I will be violating this order every single day."); *Id.* ("...Randa Trapp's orders are meaningless. I will continue to speak out about this... I will still be speaking out about my experience to EVERYONE. I have also been speaking with news organizations. Soon I will be posting everything to TikTok with follow-up on X. Every video will be posted including all hearings and statements therein."); *Id.* ("... I will still be contacting everyone including banks, donors, and organizations funding BRIDGE... I have already began speaking to media and posting on X."); *Id.* at 4 (Ms. Smith speaking in the third person and explaining, "[s]he will be speaking about the funding, including all donations, grants, and monies from banks received by the Claimants and others. Companies like LISC, NEF, PGIM, Amazon's Housing Equity Fund, BMO, KeyBank

19

and all others will have to laws to govern how they dispense financial assistance to companies like Bridge, Avanath and Brighthaven Communities and others.") *Id.* at 5 ("… I will not honor ANY DECISIONS by Randa Trapp."); *Id.* ("I will still be communicating with all donors to Bridge Housing and Brighthaven Communities... These orders are meaningless."); *Id.* ("Ms. Smith will continue to communicate with all organizations working towards oversight for Bridge Housing, Avanath, and Brighthaven Communities... The order entered by Retired Judge Trapp is unenforceable and invalid.").

Ms. Smith consciously researched personal (Ms. Harvey)[5] and professional (Mr. Carter and Mr. Novack) connections to Mr. Lombard and BRIDGE, and she deliberately made inflammatory statements to leverage those connections to achieve the goals that she has claimed all along—to "disrupt BRIDGE and force out its leadership to retaliate against them for her termination." ECF 1-1 at 22. Ms. Smith disseminated these statements to the world through the Scooter account and attempted to bolster her credibility by posing as an unrelated third party by the name of Scooter Ames. Ms. Smith's objectives are transparent, and she cannot evade the finding of contempt by hiding behind a pseudonym.

### d. Ms. Smith Failed to Refute BRIDGE's Evidence of Contempt and She Has Not Demonstrated That She is Unable to Comply with the Confirmed Permanent Injunction

In contrast with the substantial and compelling evidence submitted by BRIDGE, Ms. Smith has elected not to respond to BRIDGE's Motion. She has, therefore, failed to refute the evidence submitted to the Court, and she has failed to present any evidence demonstrating that she is somehow unable to comply with the Confirmed Permanent Injunction. Where, as here,

---

[5] This does not appear to be the first time Ms. Smith has attacked the spouse of her perceived enemy and contacted their employer. In *Fox v. Smith*, Civ. Action No. 15-1-9035-52 (Sup. Ct. Cobb Cty., GA 2016), when Ms. Smith fell behind on her rent, she "repeatedly and falsely accused the husband [the landlord] of being a pedophile and the wife a collaborator and conspirator with her husband. Ms. Smith went so far as to make her accusations to both of their employers." ECF 1-6 at 11–12. Ms. Smith was found liable for defamation (slander and libel) in that case.

sworn statements concerning contempt of court are uncontroverted, a district court need not hold a "full-blown evidentiary hearing." *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1324 (9th Cir. 1998).

Ms. Smith cannot avoid her court-imposed obligations by ignoring the proceedings, and the court remains empowered to hold her in contempt. *See e.g. Future Motion, Inc. v. Tony Lai*, 2024 U.S. Dist. LEXIS 238354 *1, 14, 2024 WL 5347389 (D. Or., Dec. 10, 2024) (holding defendant in contempt, notwithstanding his refusal to appear in the action, for continuing violations of injunction, and ordering defendant pay compensatory sanctions in the form of fees and costs). BRIDGE presented sufficient evidence to demonstrate that Ms. Smith was aware of the Confirmed Permanent Injunction and that her posts on the Scooter account violated the Confirmed Permanent Injunction. Because the "circumstantial evidence is sufficient to support an inference that [Ms. Smith] took deliberate action to avoid the reach of the court and willfully violated the Court's [] injunction…," the court finds Ms. Smith's violations of the Confirmed Permanent Injunction were willful. *Id.* at * 10–11.

e.  **Ms. Smith Shall Be Subject to Appropriate Sanctions for Her Contempt**

Having found Ms. Smith in contempt for her willful violations of the Confirmed Permanent Injunction, the court must fashion the appropriate sanctions. As BRIDGE noted in their Motion, their request of Ms. Smith has been incredibly simple from the very beginning— stop defaming the company (including its leadership) and leave its funders, lenders, business partners, and housing authorities alone. Nobody is forcing Ms. Smith to violate the court's Orders, and her behavior is entirely within her control. The Court imposes contempt sanctions with this in mind.

Where, as here, a defendant continues to engage in conduct requiring the plaintiff to repeatedly seek injunctive relief from the Courts, the award of the plaintiffs' attorneys fees and

21

costs are appropriate compensatory sanctions because "*but for* Defendant's continuous violation of the injunctions, Plaintiff would not have suffered the harm—i.e., thousands of dollars in attorney's fees." *Future Motion, Inc. v. Tony Lai*, 2024 U.S. Dist. LEXIS 238354 *11, 2024 WL 5347389 (D. Or., Dec. 10, 2024) (emphasis in original). Here, the first injunction against Ms. Smith was entered in early November 2025 (the Preliminary Injunction). From that moment on, BRIDGE has had to seek continual relief from the Arbitrator and the court to receive protections for which it was already entitled since the first injunction was entered. Indeed, while the Petition was pending, the court issued a Temporary Restraining Order because Ms. Smith continued to violate the Permanent Injunction. The court extended the Temporary Restraining Order while the Petition remained pending. ECF 16, 18. The moment the Permanent Injunction became an order of the court, Ms. Smith violated it again, which required BRIDGE to file the instant Motion. Ms. Smith has caused BRIDGE to repeatedly request and receive the same protections time and time again. Appropriate compensatory sanctions, therefore, include BRIDGE's attorneys fees and costs incurred in this action. *Id*. at *2–3 (awarding "reasonable attorney's fees incurred to date" as an appropriate sanction for repeated violations of injunction); *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985) ("[T]he cost of bringing the violation to the attention of the court is part of the damages suffered by the prevailing party and those costs would reduce any benefits gained by the prevailing party from the court's violated order").

Within twenty-one (21) days of this Order, BRIDGE shall submit to the court its calculation of reasonable attorneys fees and costs. BRIDGE need not brief the reasonableness of its rates, as the court has already adopted the Arbitrator's analysis finding BRIDGE's Counsel's rates are reasonable. ECF 1-1 at 26–28, ECF 20; ECF 24.

To bring Ms. Smith into compliance with the court's Order, the court will also issue coercive sanctions that are carefully crafted to incentivize Ms. Smith "to comply with the court's orders in the future" and which will therefore be "conditioned upon [Ms. Smith's] continued noncompliance." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1481 (9th Cir. 1992). Ms. Smith has the opportunity to avoid these coercive sanctions by taking the following remedial steps.

Within 21 days of this Order, Ms. Smith shall file with the court a sworn statement, under the penalty of perjury, detailing the content required by this Order. The statement shall include Ms. Smith's attestation that she has removed all posts from her public platforms and accounts to the extent those posts fall within the ambit of Prohibited Statements or other conduct prohibited by the Confirmed Permanent Injunction. For the avoidance of doubt, this remedial action shall not be limited to posts on the Scooter account and shall include all accounts on TikTok, X (formerly known as Twitter), YouTube, Facebook, Instagram, and any other social media, online forum, or digital platform over which Ms. Smith exercises ownership or control. Ms. Smith shall include screenshots or URLs for all covered accounts to support her attestation. The attestation shall also include Ms. Smith's sworn statement that she will not, now or in the future, knowingly violate the Confirmed Permanent Injunction.

If Ms. Smith fails timely to submit the required sworn statement, the following penalties will take effect immediately upon the expiration of the 21-day deadline. Ms. Smith shall be subject to a daily fine of $200 a day, payable to the Court. *Omnigen Rsch., LLC v. Yongqiang Wang*, 2018 U.S. Dist. LEXIS 250096, *33–34 (requiring patent-infringing defendant to submit proof of compliance with Court order and imposing $200 a day fine to be imposed if party failed to come into compliance within 21 days).

## IV.    CONCLUSION

The Court GRANTS BRIDGE's Motion for Contempt, finds Ms. Smith in contempt, and imposes against Ms. Smith the sanctions identified in the accompanying and concurrently filed Order. BRIDGE may submit its fee petition.

**IT IS SO ORDERED.**

Dated:   April 27, 2026

Hon. Michael H. Simon
United States District Judge